CONNECTICUT GENERAL You may proceed. Thank you. Good morning, Your Honors. My name is Doug Rovins, and I represent the appellants. A court has no discretion to enforce a settlement where material facts are in dispute. An evidentiary hearing must be held to resolve such issues. Now, those aren't my words, but those are the words of the Ninth Circuit in the case of Inree Equities Anaheim v. Lincoln Plaza Development, 22 F. 3rd, 954, a Ninth Circuit 1994 case. What has happened here is that my client was deprived of a hearing and was deprived of the opportunity to take discovery in order to develop their response to the defendant's motion to enforce a settlement in a class action case here. The problem I have is at the time of the Spitz settlement, your client knew that the written policy didn't provide that it could be paid up with four premiums. They'd gotten a letter from Kathy, I've forgotten her name, showing that at that point in time, the policy had a net cash value of under $3 million and that further premiums would be due over the life of the policy. They had the information that the Spitz claim involved the exact type of policy that your client had. Don't the undisputed facts show that it's a matter of law that you were on inquiry or knew that you had a claim and therefore were bound by the Spitz settlement? Your Honor, I don't believe so. And the reason is this. It's, I think, in the hypothetical where there were prior representations being made to a client and then there's a class action filed and a settlement and there's no ongoing further communications between the defendant and a member of the class who is not a named plaintiff but a putative class member, I would agree. In this case, however, there were ongoing communications between the insurance company, which is in a much superior position than my client was, with respect to the policy, the terms, whether additional premiums were required or not required. I think the problem here is a summary judgment standard should have been applied and it wasn't. Counsel, is the standard as to whether your client knew or should have known? Not at this point, Your Honor. I don't believe so because I believe that Judge Walter leaped ahead. But what is the standard, knew or should have known? I believe the standard is, in this case, that because we asserted equitable estoppel, that the issue is whether, A, our client actually knew or was dissuaded from pursuing a claim. So let's assume that our client was informed that your policy actually is implicated by the Spitz settlement and you may well be entitled to pursue a claim. And then the company comes forward, dissuades the client and essentially says, your policy is not a problem here. It's paid up. You don't have any damage, so don't pursue a claim. Where is that representation? Well, that's the problem we have, Your Honor. There was a series of discussions and representations made. The representation that Your Honor is referring to was a letter from Representative Catherine Southrup, I believe. Right. And it related to some communications that are not fleshed out in this record at all. Where is there a communication after that letter that suggests that your policy is different and you're paid up? Well, the evidence was presented by way only by, at this point, by way of declaration from my client, which I believe is under tab 9 of the excerpts of record, where he testified that there were subsequent communications and what his belief was based upon what he received. Where in his declaration is there a communication after the letter from Cathy? Your Honor, his declaration, if I may grab it for a moment. He says at, and I'm at 494, under tab 9 of the excerpts of record, at paragraph 14, that in April of 2000, I'm paraphrasing, that there was a communication from Lincoln advising that there was this new dividend policy that was going in place that was going to potentially alter the policy, which is something that had never been received before. And so up until this time, his only information was that there was no additional premiums that were going to be required here. In February of 98, there is also reference. I read that paragraph and I was trying to figure out what does that have to do with anything in light of the claims of equitable estoppel and the fact of what you actually knew or your client knew about the Spitz litigation? I mean, I'm kind of left like in a disjunctive situation. Well, our position is this, Your Honor, that there was at least a factual dispute as to what information was being provided during the course of the litigation and subsequent to it as to whether our client should participate or not participate, opt out, or participate in a claims analysis program. They did neither of those, and my client says the reason they did that is, A, there were ongoing communications that indicated to them that the policy was not really implicated, it was not a problem, that they had no damage because they had paid up and there were no additional premiums being requested. But, you see, that's one thing, to have some objective evidence that raises a question of fact on equitable estoppel, you need to look at a representation from the other side, and that seems to be what's missing here. So you've pointed us to one thing in paragraph 14, there is that letter. Correct. Is there anything else that you would view that's in the record as a representation that invokes the estoppel or a question of fact? Well, I believe that the letter from Kathy Sastrup does, because even though she gives some type of projection, at the point she's sending that, she, at least the company, knows that this policy is implicated in this litigation and in this settlement. And if you're going to speak and you have superior knowledge and the insurance company is a quasi-fiduciary, Your Honor, you're looking to ask me to stop. Then I believe you have to fully speak. You can't send some information that I think objectively can mislead someone who's not experienced in insurance. But Sastrup's letter says you don't have guaranteed coverage of $3 million, which is what your client says he was told from the beginning. And it says you either got to pay money now or at least in five years you've got to pay a premium, which is contrary to the representation that your client says Midwest received. So how can that possibly be a reassuring letter? Well, her letter says, and I think the face of it says, good news, your policy is fine, essentially, is how our client read the letter. And that's what it says, good news, your policy is fine. The problem we have here is we asked to take discovery so we could develop what actually was said. And these are memories of parties that are in business that may not have all the facts themselves. And we're denied that opportunity. And where is there evidence your client was given any kind of oral communication after the Sastrup letter? I'm sorry, before that? No, after that. I mean, at the time that letter was received, your client still could get into the Spitz litigation. Correct. Where is there a communication after that, before the termination of the Spitz litigation, that represents that your four premiums were all you needed to do, and you have $3 million guaranteed no matter what happens over the life of the policy? That was one of the reasons we had asked to take limited discovery so we could depose and determine what communications had occurred. Because just because, and normally you get discovery, especially in advance of a summary judgment hearing, which essentially this was without a hearing. So one of the errors that we've alleged is the court denied us an opportunity to develop that. And I think it essentially granted summary judgment. I'm sorry, Your Honor. In your client's declaration, if in fact he had all these oral communications, should not that have been included in his declaration? What I'm suggesting, Your Honor, is people's recall is not as good as we'd like it to be. And I think we should have had opportunity to develop the record before this was summarily denied. That doesn't make any sense. You're saying, well, maybe my client can't think of any oral representation on which he relied, but maybe if we talk to the other side, they'll say something, and then that will spark his recollection that he relied on something. I mean, that kind of, to me, pulls the rug out from under the reliance on equitable estoppel just by virtue of its construct. So if your client can't think of anything and can't show any document, then I'm kind of hard-pressed to understand why he would have a legal right to discovery. Assuming the documents that we have aren't sufficient. Correct. My view, Your Honor, is that in advance of what was a summary judgment, a party is entitled to take discovery to obtain documents, to help refresh recollection, to do those things, because people's memories are not clear, and as we get older, it's more difficult. And I think we've denied that right in a summary fashion. Well, this is what we call a fishing expedition, which we discourage. Is it not? I don't believe so. I think it would be normal discovery in any type of a lawsuit to help develop facts, Your Honor. Good morning, Your Honors. I'm Sneedham for the appellee, and I have with me here my colleague, Mike Gatto, who did much of the briefing. I want to get initially to the argument that Appellant made in the opening, which is that there's some kind of a rule about enforcement of settlements and material facts being in dispute, and the requirement that that be done on some basis other than a summary basis, and that there be sort of evidentiary processes and an opportunity for discovery. And respectfully, I don't think that there is any such general rule. In fact, I think in the context of essentially enforcing anti-litigation and re-litigation injunctions that are part of class action settlements, such a rule would absolutely undercut the very purpose of such injunctions. That is, if defendants who have bought peace of mind have entered into a settlement and get in return a piece of the settlement, an anti-litigation injunction, if they were put to burdens of discovery and evidence-taking and evidentiary hearings, that's what we call litigation, and therefore they're not getting the advantage of a re-litigation injunction by definition. Let's get kind of to the heart of the conduct of your client. Should they have said, look, you're involved in the Spitz litigation or the claim, and you better join in? No, Your Honor. In fact, I think they would be on very dangerous grounds in doing such a thing, and in fact might even expose themselves to additional claims. When we remember that, when there's notice given of a class action, that's something that's usually very heavily negotiated. It's something that the court itself is involved in, and it approves that the class action be explained in a certain way so that no one mischaracterizes it, so that parties understand exactly what their rights are. Once the court has approved such notice, and it's given not once, but twice, for defendants to then, in collateral communications or communications that they may have as part of an ongoing relationship that exists, for them to then purport to discuss and advise a plaintiff's... carefully and sort of minimalistic reference to it. But in this case, I don't see that as an issue, because the plaintiffs have never disputed that they got the very full and complete notice multiple times that was actually sent by the court. Indeed... And usually those notices actually have some restrictions on communication with class members in the context of the class action, do they not? That's a good point, and I just honestly don't know whether this one did or not. But that is something that speaks to the concern that I was talking about some moments ago. What about the adequacy of the representation of the class representative? I think that that is really a complete red herring here. There's no reason to believe that the Midwest Bridge plaintiffs were in any way differently situated from the great mass of the case, and perhaps indeed the main plaintiff. That is, this class was not defined in terms of policyholders whose policies had in some sense gone underwater. That was not a requirement of being a member of the class. It was not a requirement for getting any relief that was provided for under the settlement. And I suspect that in the normal case, just because of the timing, it may be that most class members' policies had not actually gone underwater. But they were holding a valid claim, which is that they had a policy that did not conform to what it was represented to them it would contain. And they were entitled at that point to go in through this administrative, or this alternate dispute resolution process, this sort of streamlined claims process, to come in and say, this is what I was promised, this is what the policy is, there's no match, as was explained in the notice of the settlement, the remedy for that was to have the policy reformed. So precisely what the plaintiffs are asking for now, they were entitled to then. So they were not differently situated. It's not in any way analogous to the situation where you have, you know, latent asbestos injuries, and so some claimants are out there who are not even known or knowable, who don't even have a claim yet because they haven't incurred an injury. The Midwest Bridge plaintiffs, like plaintiffs generally who are part of this class, had a claim simply by virtue of holding a policy that didn't match the terms that they were promised in some way. Counsel, I guess the other question is, did this letter mislead and lull them into a sense that they didn't have to do anything? Now, was it misleading in that sense? I simply don't see how any reasonable reader of the Sackstrup facts could reach that conclusion when it specifically spells out the contingent nature of the policy. In other words, it may have referred to good news, but that statement really doesn't have any meaning unless there's a possibility of bad news. I mean, that statement carries with it what is really set forth in numerous ways as the doubt, which is the premise that this is a policy that's contingent on interest rate behavior in the market. Here's a projection based upon rates as they are, and then it says, you know, this could change depending upon the rates. So how anyone could read that and conclude that that was some kind of a statement that these policies are, you know, your policies are somehow guaranteed or somehow not susceptible to interest rate fluctuations. I just don't see how any reasonable reader of that could reach that conclusion. And it's never really specifically alleged anywhere, if you carefully read the allegations, that, indeed, that was an inference that somebody drew from that particular communication. And that is, indeed, the closest thing we have to anything amounting to any kind of post-settlement misrepresentation that would give rise to some sort of new and independent basis for a new and independent wrong in how to do harm. If you look at the other things, yes, there was an ongoing relationship by virtue of this policy. There was a communication from Lincoln Life about how it had acquired the Cigna policy. There was a communication about dividends, which didn't really speak at all to this question of interest rate contingency. So I think what's happening is the plaintiffs are sort of throwing up this shaft. You know, there's talking about things that happened, communications that occurred because of this ongoing relationship. But nowhere are they really identifying any kind of actual independent harm, something different from the harm that was the harm at issue in the Spitz litigation. And even more than that, nowhere are they even identifying any repetition, really, of the pre-settlement misrepresentations, much less a new and different misrepresentation giving rise to a new and different harm. And I actually found the relatively recent case from the Ninth Circuit, which is the Raines-Postabella case, which Justice Fletcher was on the panel for, to be quite instructive in this regard. I mean, that was a case where the court focused on was there really a new and different harm in these claims that are asserted by class members outside of the case in which the class action settlement occurred. There, plaintiffs in the class action had talked about or the basis of their allegations was a tying of credit cards to debit cards and how that had caused merchants to pay a higher rate of interest or a higher interchange rate to the credit card banks. And then some of those class members filed another litigation in which instead of this sort of tying of the credit cards to debit cards, they were relying on somewhat different facts. It just had to do with this notion of a price-fixing conspiracy rather than the tying of credit cards to debit cards. So the facts were slightly different. The theories under antitrust theories were different. The court said it doesn't matter. The basic harm is that the merchants got charged higher rates by the banks, a higher interchange rate. And the fact that the problem is the same means that these things stem from the same common nucleus of operative facts and therefore there's an overlap and therefore the settlement in the class action applies to bar those claims. It's the same thing here. Well, no, the issue is completely different here. What we're looking at is whether this individual was misled. That's really what it's all about here. And that happened that gives rise to a claim that's different from the claim based upon the misleading that happened that was settled in the class action. And my argument here is that no, because the harm would be the same. Even if there were a misrepresentation that we could find somewhere in the record or that somebody had put in an oral declaration or a declaration based upon their memory without a document, even if there were such a thing, we still wouldn't have any new and independent claim of harm other than the fact that they were simply holding the policy, which doesn't have or doesn't operate in the way that they were represented to believe it would operate. And so you would still have no new and independent misrepresentation claim based upon that. But I don't think you have to get there in the sense that I agree with what the panel's line of questioning seem to be suggesting, which is that there is nothing in the record such as that. Thank you. There are two points. One is I think what we're talking about here, at least what I'm trying to articulate, is a question of due process. We have a situation where a client has made certain allegations of a continuing course of conduct of guarantees and so on, and was I believe denied the appropriate procedural and substance safeguards of a summary judgment proceeding, which requires the moving party to put forth the statement of material facts are undisputed, allows the responding party, once they receive the motion, to make an application to take some discovery, if none has been allowed so far, and respond in that fashion. And I believe that should have been applied here, and it's a due process problem. The second point is the one of damage. The way this settlement worked was that if you wanted to pursue a fraud claim, you had to present sufficient factual basis so that it could be evaluated. Here, my client had no indication and had no idea that six years later, they were going to be hit up with a half a million dollar premium payment that was due. And I think we should have the opportunity to evaluate that, but I would not, I would not, I would not, I would not, I would not, I would not, I would not, I would not, I would not unilaterally deny. Thank you.
judges: B. Fletcher, McKeown. Whyte